Mr. Nadich, good morning to you. Good morning, Adam. Please proceed. May it please the court, my name is Edward Nadich and I represent the appellant, Mr. Jackson. The issue in this case is whether the VA violated Mr. Jackson's due process rights by failing to investigate and determine his claim for service connection in a manner that was impartial, unbiased, and neutral. And more specifically, whether the VA violated his due process by soliciting a second medical opinion from the VA medical examiner with a skeptical request that suggested to the medical examiner that she should base her new conclusion solely on what appeared in Mr. Jackson's medical record and not based on Mr. Jackson's own statements and her own examination of Mr. Jackson. And I submit, Your Honors, that soliciting a medical opinion in this manner… Let me interrupt you just to be sure I understand what you're talking about. You're talking about the communication from Mr. Andrews to the medical center? Yes, Your Honor. A single email message? Yes, a single email message, but I think there's much more than just the email indication in the record that indicates that the process in which the VA indicated and adjudicated his claim was not an impartial, neutral process. You're losing me right away. I saw the email message. I've read the text. I've tried to figure out what it fairly can be thought to mean. I'm not aware of any other document that would arguably show bias on the part of Mr. Andrews. I'm not aware of any document that would show bias on the part of the other members of the rating board. So I don't know what you're talking about once you get beyond that email. Well, the issue is not only was he biased, but was it an impartial process? There have been several decisions in the Veterans Court where they've said… No, no. I'm not interested in case law. I'm interested in the evidence in this case. You've got the Andrews email. What other document shows bias or non-impartial or rigged or any such thing? Your Honor, I would submit that Dr. McGapian's second opinion where she totally flips her conclusion and the reasons why or the lack of reasons why is also indicative of that it was not an impartial process. OK. We'll look at her second opinion and we'll look at the Andrews letter and we'll try to see what inferences could reasonably have been drawn by the fact finders. So before I have the email right here, which is on page 820 that Mr. Andrews sent to me, but I want to preface it by saying that Mr. Andrews had before him two positive opinions that Mr. Jackson from Nurse McFadden and Dr. Troy both said his disorder went back to his service days. Yeah, based on? Based on their observations, what Mr. Jackson… Well, isn't it sort of reasonable to say what does the medical evidence show? Well, Your Honor, I think what this really goes to, a key case here that is Buchanan v. Nicholson, which is cited on page 17 in our brief, and that was decided by the Federal Circuit last year. And it's actually quite similar, it has a lot of similarity to this case. In that case, what happened is, like this case, there was a veteran who, 20 years after service, he had a schizophrenic psychiatric disorder. And he said, you know, this started when I was in the service. But in his case, unlike this case, he had nothing in his medical records to show that the symptoms started in the service. So he submitted lay testimony, statements by friends and relatives that said, yes, I knew Mr. Buchanan when he was in the service. That's not relevant. You really should answer Judge Bucklow's question. Why wasn't it perfectly reasonable to ask the psychiatrist to also consult the 20-year record of treatment in VA medical facilities so that that would be part of the basis of their final opinion, along with statements that your client had made? What's unreasonable about that? It seems like it would be the most obvious, common sense thing to do. Because I submit, Your Honor, that he did much more than that. His email, he said, Dr. Armstrong, check the AMIA request for this examination. Doctor was to review the service medical records to determine if a situational episode in service was representative of bipolar disorder. Then he quotes from Dr. McGeachy's first opinion. He says, on what basis did she conclude that the disorder had its beginnings in 1973? She did not provide any rationale or provide any quotes of what she found in the service medical record to justify the opinion she gave. Is there any evidence to support her opinion? The fact of the matter is she did give a rationale. She talked to him. She examined him. She listed his symptoms. It was a quite detailed report. She listed all of his symptoms. Well, that's all correct. But the thrust of the communication by Andrews, as I understand it, is also check the documentary record of his medical file from multiple medical facilities in the VA system over a two-decade period. Also look at that. What's wrong with that? I would suggest, Your Honor, that's not what he said. He did not say, oh, in addition to what you've already done, please check the records. This is a very skeptical email. If I get an opinion that says – he's saying – Look, if we're going to decide things based on totally subjective notions like you think it's skeptical and I don't think it's skeptical and Judge Shaw thinks it's half skeptical and Judge Bucklow thinks it's two-thirds skeptical, that's not law. There has to be some kind of standard here. You're reading a lot into this, it seems like to me. It seems to me his message can equally be read to say that other than possibly assertions by the veteran, there's no source indicated in the psychiatrist's earlier report for her findings. And so the message asks for what are the sources. It doesn't say you have to come out the other way. It just says what are the sources and what did they show? I think we need to also look at Dr. McGeachin's opinion. In her first opinion she made a very unequivocal statement. She concluded that yes, his bipolar disorder first occurred when he started in the service. Unequivocal. In her second opinion. So what? The point isn't whether her statement was clear or unequivocal, the point is what was the basis. No, but I think you need to look at why she changed her mind. In her second opinion. She's not the decision maker though, so it's not her bias that's at issue. That's right, but I think what you have to look at here. There's been several veterans court cases that we've said in our brief. Coleon v. West, Austin v. Brown, Beale v. Brown. Where they say if the VA submits a request that suggests its own answer or limits the field of inquiry or doesn't give you the full picture, doesn't ask for the full picture, then it's a due process violation. Especially you have to scrutinize it in a case where you have an adjudicator and an investigator playing both roles. Now, the reason why I think her opinion, I believe Judge Mischel's point is that you can read this to say this is a perfectly fair email. I'm saying she got the message and whether she, and I think you can tell the way she read the message. And the reason I say that. Well, wait a minute. Do we have testimony from this psychiatrist? No, we don't, but Judge Mischel, Chief Judge. You're really asking an awful lot to suggest that she was coerced by Andrew's message because her second opinion said some things different from her first opinion. Now, if you had testimony from her saying that she was terrified when she got this message and she thought she was going to lose her job and blah, blah, blah, that might be a little different. I would make a couple points. First of all, this court has repeatedly said and Congress has said that the veteran system is a non-adversarial proclivity. We know all that. There's no dispute of that. The government isn't arguing to the contrary. Well, the reason I read that is I'm not sure there is a mechanism to depose Mrs. McGuigan. It's a non-adversarial system. I'm sorry, Judge Holland. You could interview her. You could depose her as a part of the MSPB proceedings. You could call her as a live witness. You could call Andrews as a live witness. Maybe Andrews also called her up on the phone and scared her to death by threatening statements. But you don't know because you didn't check. You just have a letter, and you're asking us to construe the letter the way you construe it. It looks to me like it's equally amenable to a very innocent construction. Maybe we have a failure of proof problem here where one reading of the letter suggests a bias. Another reading of the letter suggests no bias, and you don't have any other evidence because you didn't gather any other evidence. I submit I do have other evidence. Just to finish this point, Dr. McGuigan, in her first opinion, like I said earlier, she was unequivocal. She didn't make any bones about it. I conclude that it started in his service. Her second opinion, she says, I've now reviewed his records, and I can't find any corroborating evidence. And she says, therefore, I can't assume that this one document from this one episode is the same thing as bipolarity. What she's clearly done is she's discounted all of his statements to her. Buchanan v. Nicholson, the court said, you cannot do that. And Buchanan v. Nicholson, the court said, the board committed error. The reason it committed error is because it completely discounted all lay testimony as not credible simply because it was not corroborated by the medical records. I would submit that's exactly what happened in this case. This issue isn't a matter of a lay person versus a professional. This issue has to do with what factual descriptions of his first psychotic episode existed in his active duty service records from 1973, shortly before he was discharged. I would submit this does have to do with lay testimony because what happened is Dr. McGapien got the message that I'm not going to consider all the symptoms that he told me in my first report. In my first report, I said unequivocally, she concluded, she said, it first started when he was in the service. And now she, for unexplained reasons, really, she said, and you can tell why, she said, there's nothing in his records to corroborate. And I would also suggest that the request is subtly discounting the evidence that is in the medical records. Wait a minute, wait a minute, wait a minute. The second report doesn't say that I now know that everything the veteran told me is a lie. There's no such indication in there. All she says is the description of the incident at the end of his active duty period doesn't correlate with the particular mental disorder for which he was later diagnosed. I respectfully submit that's not what she said. She said it can't be assumed that they are correlated. I have her, what? What's the problem with that? What she says is that there's no, I find nothing in his records to corroborate that. Her first decision, she was unequivocal. She said, you know, I've listened to his testimony. And I've listened to what he's told me. I've listened to his symptoms. And this court last month had a decision in John Drow, which is not in our brief because it was after I replied to your first file, where the court basically reapplied Buchanan. You ever heard of Rule 28 for submitting subsequent authority before an oral argument after briefing has been filed? I apologize, Your Honor, but it just reapplied the Buchanan rule. But there is a statement I would like to read from it. So it's somewhat duplicative of Buchanan. But he just says it nicely here, where it says, Lay evidence can be competent and sufficient to establish a diagnosis of a condition when, and then there's three points. The third point is lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. That's exactly what happened in Dr. McGeachy's first opinion. She listened to his symptoms. She came to an unequivocal opinion. And then she was asked to revise her opinion. What was the source of the active duty description of his psychological incident? Well, he reported being jumpy and paranoid all the time. The specific incident in the service medical records, the active duty service medical records, what was the source of that description of that psychological incident? Situational anxiety. What was the source of it? Who was the source of it? Mr. Jackson reported to the Naval Hospital. So it's the same source. It's Jackson talking to one psychiatrist back in 1973 and Jackson talking to a different psychiatrist in 1990 or whatever it was. So he's the source in both cases. That's right. So his self-description of what he experienced near the end of active duty is what the psychiatrist looked at to try to see whether that looked like an incident that shows bipolar disorder or it looks like a psychological incident that shows some other condition. But I submit that's not exactly what she did. She looked at the two data points. She said you've got the 1973 report and you've got today. What else can I find in the record where he reported that would corroborate? I've got two data points and she said I can't find anything else to corroborate that, which is what Mr. Andrews suggested that she do. And I think it subtly undermines the evidentiary value of the first report, which I think is a very good evidence in and of itself. It says the first 1973 report compared to Buchanan, this guy actually had evidence in his record that he reported being paranoid all the time. And they're asking him, well, what else can you find in between? It kind of discounts the first data. It's like what else besides that original report can you find? Your argument complaint on the document page 20 is really with the first two sentences of the last paragraph, correct? I mean, I understand you to be saying if this was simply an e-mail that said, please check with Dr. Nagevian to see if there is any evidence to support her opinion. That wouldn't be a problem. You think there's the thumb on the scales with respect to the first two sentences of that paragraph? Yes. And I think the fact that he's saying did she provide any rationale suggests you haven't shown me any rationale yet, which I believe she did, which is based on his own statements and the VA system here. I also believe the very first two sentences in the e-mail itself in the first paragraph, they are saying, look, you didn't follow directions. And this is a very, I think this is a very sort of, in a way, it's an accusatory. You didn't follow directions. You have to go look at the service medical records and find other data points in between these two. Otherwise, you haven't provided me any evidence. All right. We'll hear from Mr. Smith. Now, Mr. Smith, on the procedure here, was the rating decision at the regional office made by Mr. Andrews alone or by multiple decision makers? I'm unclear on that. I think it was made by him alone. There was some reference to a rating board. Board, in my reading, means multiple decision makers, not a solo decision maker. Right, exactly. I think that's why I'm unclear on that, because the decision, I think that's at page 22, appears to indicate only Mr. Why don't we know? We don't have the actual rating document? No, it is. It's here at page 22 through 24, I believe. Well, I thought you argued somewhere in your brief that it was approved, ratified, co-decided, co-signed, or something of that sort by other officials in the RO. I hope not. I don't think so. Our point in the brief is that all of this is a process that took place before de novo review by the board. Well, I understand the business about the Board of Appeals, but I'm still at the RO level trying to figure out what happened there once the follow-up report from the lady psychiatrist was submitted in response to Mr. Andrews' request. Then what happened? Who decided what? It appears that Mr. Andrews himself made the decision. Alone? At page 22 through 26, on 26 is his signature. Now, what's the process? Is that a final decision, or does that get reviewed by some higher-level official in the regional office, or what? That is the final decision unless appealed to the board, which it was, of course. And, again, that is our point here. It is a de novo review to the board that Mr. Jackson was represented by counsel. It is a full and fair hearing. Now, when you say hearing, there's no live hearing, right? I think there is. If you look at the board's opinion. Not with testimony. I believe there is testimony, Your Honor. I have it here. Witnesses at hearing on appeal, veteran and his wife. That is our supplemental appendix. Page 29 is where that starts. Was the veteran and his spouse, were they the only live witnesses in front of the board? That appears to be the case. So the psychiatrist was not called. Correct. And Mr. Andrews was not called. Right. But the appeal, as argued by Mr. Nadick, is all about Andrews and Malkakian. That is the issue here today, yes, exactly. The purported bias is on the part of Mr. Andrews, by the way. So are you trying to argue that there was no charge of bias presented to the board and, therefore, it's waived thereafter? There was a charge of bias presented to the court. Don't jump ahead. We got out of the RO. We're now on the board. At the board level, is there record evidence that the charge of bias was leveled? I don't believe so. Well, then why aren't you arguing waiver, especially since he was represented at that proceeding? Well, our argument is that the board procedure is a de novo hearing, a full inter-opportunity for the veteran. Yeah, that's an argument for cure. I'm asking whether there is also a basis of waiver. Well, we did not argue that. Did you waive the waiver argument by not making it? I accept that. If that's the case, we did not make it. Did the board have all of the reports in front of it? Yes. The board's, as I said. Dr. Choi's report and all the other doctors and the two reports of Malkakian, everything in front of the board? Yes, everything. It's, like I said, it's a lengthy opinion. It's signed on page 18 of it, so it's an 18-page opinion. It goes through all the procedural history and the history of Mr. Jackson's examinations. Are there findings about bias? No, because, as I think we've just discussed, that appears not to have been alleged at the board level. It was the sole allegation of error committed by the board, or I guess committed below, at the court stage. At the Veterans Court, that was the sole basis of error, was that Dr. – I'm sorry, Mr. Andrews was biased in that email. And again, well, again, that is – it's certainly – that you think squarely supports your theory that since the standard of review by the Veterans Board of Appeals is de novo, that that automatically cures any tainted decision by a regional office official? I do not believe there is a case on point. Are you trying to make it in this case? Well, no. Trying to make some new law here? The point of our suggesting or of the fact that the board process was de novo is to – it goes to the due process issue. Due process is a notice, an opportunity, and a fair opportunity to be heard. So you're saying that at that level, there was, again, a complete opportunity to prove that he really was disabled back in 1973? Mr. Jackson was given a full and fair opportunity to demonstrate service connection at the board level. This occurred in time after the purported bias by Mr. Andrews. Therefore, no matter what Mr. Andrews did, Mr. Jackson and his lawyer had an opportunity to demonstrate service connection at the board. But, Mr. Smith, suppose it were true – I'm not suggesting that it is true – but suppose it were true that Dr. Malkakian – I'm probably butchering her name, but hopefully she'll forgive – was terrified by the Andrews message. Or let's even suppose that Andrews called her and said even more forceful things than some of the statements in the email message. And let's suppose that as a result, her second report, I'll call it, was way more negative than she would have had it be absent the, quote, pressure from Mr. Andrews. Wouldn't that sort of taint carry through? Because the board, although doing de novo review, is going to have the second Malkakian report in front of them. And in my hypothetical version of the facts, it's going to be a tainted, unreliable report. So why wouldn't that taint the entire proceeding in front of the board despite the de novo standard of review? Well, if everything you just suggested – Yeah, it's a hypothetical question. If all of that was true, yes, it would appear that a piece of evidence before the board would be, to use your word and frankly to use the law's word, tainted. That would certainly be a problem. Whether that would be a denial of a fair opportunity to be heard, though that is a due process violation, I don't think that accounts for that. There would be a full opportunity for Mr. Jackson, again, to present whatever evidence he wants. He certainly – well, I guess I don't want to go back to the facts because I'm using your hypothetical facts, but there is other evidence upon which Mr. Jackson relies that theoretically would be against this tainted evidence. So is this a close psychiatric question? Obviously a very pitifully disturbed individual. Alcohol abuse, drug abuse, on and on and on over a very long period of time. Some very unfortunate incidents during his time of active duty service as a marine overseas. I don't remember the details. Maybe Vietnam. Spain. Spain. Yes. So the question is whether the later diagnosis of bipolar disorder correlates with some facts that occurred during active duty that would create a basis of saying there is a service connection for this particular disorder, the bipolar disorder, versus there was some other psychiatric problem in Spain during active duty, but different from the bipolar disorder from which he has suffered in recent years. That sounds like kind of a close call where a lot of psychiatrists might even disagree, and yet the board doesn't have any psychiatric testimony other than these sort of canned reports. Well, I think your second scenario there is closer to what we have here. That is situational anxiety is the psychiatric term that was used in 1973. Bipolar disorder is a different problem. It is not a – he was not diagnosed with episodes that are bipolar in 1973. Are you saying he should have brought in a psychiatrist to show that the situational anxiety for which they actually sent him home was a symptom of the later diagnosed bipolar disorder? If that is true, I don't think – Well, assuming it was true. Well, the psychiatrists who are – who have documented the case don't say that. He was discharged prematurely for psychiatric reasons? He had a three-year assignment. He was discharged prior to that. He was not discharged immediately after the psychiatric evaluation that is in the record. He was – What was the basis of the discharge? I think unreliability is the term that is used in the report. I don't think – It was based on psychological or psychiatric type behaviors? Yeah. I mean, after the situational thing, didn't they send him – send him, at least the way I read the record, send him back? To North Carolina. To North Carolina because they didn't think that he should be out there and they didn't think he should have a gun. Yeah, we all – and that's the problem, and that is – well, again, that is a symptom or an effect of situational anxiety. He probably shouldn't be carrying a gun. What is situational anxiety? I'm sorry? What is that? Well, in this case, it was manifested by him being nervous and jumpy and apparently, I guess – Is that a psychiatric diagnosis that's in the manual, psychiatric manual? I think so, yes. That is – And your understanding is that it's totally separate and distinct as opposed to overlapping with bipolar disorder? Well, I think that's Dr. McGakian's opinion. That is that, yes, he had situational anxiety in 1973. Yes, he has bipolar disorder in 1992, but they are not necessarily correlated. So, again, it's not like – Well, I agree they're not necessarily correlated, but I'm wondering – maybe this was part of what Judge Bucklow was wondering – that something that occurred in Spain that was shortly thereafter diagnosed as merely situational disorder might be symptoms that would also be consistent with bipolar disorder as later officially diagnosed. Well, again, that is not what the psychiatrist who evaluated him, including Dr. McGakian, said. That would be a very simple thing to have said. That there is evidence that he was suffering from bipolar disorder because he exhibited the symptoms of bipolar disorder in 1973, although it was misdiagnosed as situational anxiety. That's a fairly simple concept. That is not what they say. It is a separate psychiatric problem. Of course, Mr. Nadick is suggesting that the reason that Malkatian doesn't say something like that is that she felt pressured to not do so. Mr. Smith, let me ask if I could one question on the jurisdiction. You say that we don't have jurisdiction because this is not a freestanding constitutional claim. Yes. I mean, why is it not? I mean, Mr. Jackson is saying that he was deprived of due process. Yes. Correct. Assume for the moment that his allegation is true about that Mr. Alexander pressured the psychiatrist in kind of a, quote, sub salientio, close quote way. Why is that not? Assuming that arises to a violation of due process, why has he not asserted a constitutional claim? Because it's the type of violation of due process that he's talking about. He calls it a freestanding constitutional claim. A violation of due process can be a, quote, freestanding constitutional claim under Bailey. But under Bailey, again, it was a notice and opportunity to be heard problem. And it isn't a freestanding claim related to this case because the issue of bias simply cannot be separated from the merits. Why not? Why not? I don't follow that at all. I know you argued that, and I just can't follow it. Because the argument is that Mr. Andrews was biased because he wasn't satisfied with the evidence that he had before him. And in order to determine whether his satisfaction or lack of satisfaction indicates bias, you have to look at the evidence that was before him. As I understand it, you would accept the proposition that the veteran, in this case Mr. Jackson, is entitled to a fair and impartial consideration of his claim. Yes. Correct? His contention is that I didn't receive due process because I did not receive fair and unbiased consideration of my claim. The psychiatrist was pressured by another individual to come around to a particular point of view. Hence, I did not get fair and unbiased consideration of my claim. Why is that not a fair constitutional due process claim? They may lose on the merits. Yes. Possibly. I don't know. But why is that not a fair claim? Well, again, if that was occurring – first of all, there are multiple answers to that question. The first one is if that was occurring at the board level, at the place where there is supposed to be de novo review of a denial of a claim. Well, the statute just says the board reviews the claim. Right. It doesn't say de novo. The statute doesn't say de novo. No, it may. That seems to be an open point. Yeah. Okay. Well – Now, are you saying that to be freestanding within the meaning of our case law, that the alleged constitutional claim has to be entirely separate and distinct with no overlap on the evidence bearing on the merits of service connection? Yeah. That the issue due process, that is, the process by which a claim is adjudicated, if there are problems in that process, the facts of the problems in that process are fair game. But if they involve the actual underlying facts of the merits of the claim, then it's not fair – it is not freestanding. Well, he's saying problems in the process. He is saying problems in the process, but what we're saying is that in order to look at whether there are problems in the process, you have to look at the merits of the claim. Yeah, but not only the merits of the claim. He's saying look at the Andrews email and look at the change of position by the psychiatrist and then draw the inferences. That kind of sounds like it is freestanding because it's based primarily on the Andrews email. Well, again, their argument is not that simple because they're saying look at the Andrews email and the report beforehand. And so are you saying then that if there is any reliance on the evidence relating to benefits as a part of the alleged freestanding claim, it can't be a freestanding constitutional claim? Well, we are interpreting the Bainley decision, which said that if you get to the underlying facts or the underlying facts of the merits of the claim, it is not fair game. That is not something that this Court has jurisdiction to look at, even in the presence of a, quote, freestanding constitutional claim. But isn't really the issue here that the facts – you're not getting to the facts on the merits. The facts of the claim provide the backdrop for the violation of due process contention. Now, if in fact one were to conclude that there was a violation of due process in this case, just being hypothetically, it would not mean that Mr. Jackson would win. It would mean – would say the process was not fair. It goes back for a redo. The way I interpret the argument that's made before this Court, that's not true. It is. It's an automatic win because he's saying – Well, that may be the argument, but I don't know as that would be the case. They are saying that there was evidence of – there was ample evidence of service connection before Mr. Andrews, and then he messed with the system in violation of due process and produced negative evidence, and it went from there. In finding that he was messing with the system – But you would say that your contention would be – you say there was no violation of due process. But I guess you would say that assuming there was such a violation, the remedy would be to send it back for a clean process, right? That is assuming both the jurisdiction and the violation and the bias, all of those, a factual finding in his favor on basically all questions. That would be your position in that eventuality? Yes. Mr. Smith, on page 20 of your brief, you seem to make a totally separate argument citing to Pierre v. West, the Federal Circuit case from 2000. And there you seem to be saying that there can't be a constitutional claim because a veteran doesn't have a protected property interest in the receipt of the benefits applied for. Am I understanding you correctly? The paragraph that begins in the middle of page 20 of the red brief? Yes. What are you really saying there? Well, again, it's that due process involves a notice and an opportunity to be heard and the deprivation of a constitutionally protected property interest. Yeah, but you say, quote, he does not have a protected property interest in the receipt of such benefits, period, end quote. Right. So you seem to be saying somebody applying for veterans' benefits can never have a due process claim because those benefits aren't property within the meaning of the Fifth Amendment. Is that what you're saying? Well, that, I think, goes more to the Fourteenth Amendment. Again, we note in the brief that we were unsure as to what the basis for the due process claim was, whether it was procedural under the Fifth or not. But you don't limit it here to the Fourteenth Amendment. Right. I apologize if that's unclear. I think that's what that argument goes more to, though. How could this involve the Fourteenth Amendment in any event? The actor here is the federal government. The federal government is bound by the Fifth Amendment. Right. So it necessarily is a Fifth Amendment claim. That is what we assumed. That is what we assumed in writing the brief. It's a matter of law, not a matter of assumption. Are you saying that even though a statute says that if you have a service-connected mental disorder, or however it's phrased, you would get benefits, that that doesn't give a property right? Assuming you meet the criteria? No. Okay. If you don't have any further questions, thank you. All right. Mr. Nadek, two minutes. First, I'd like to say that we agree, Judge Schall, that if you were to find a due process violation, that there would be a redo with a constitutionally correct procedure, which we would hope would expunge the tainted, what we consider to be a tainted opinion, of the second opinion of Dr. Nadekian. I take it you're not asking us to, in this appeal, expunge the second Nadekian opinion. I think that maybe it would be appropriate for the lower court to determine what's the constitutionally correct remedy. So then your answer is no, I'm not asking you to expunge. That's correct, Your Honor. All right, go ahead. Secondly, I want to clarify my position that we don't feel that Dr. Nadekian was somehow intimidated or harassed. I think, if I can refer to her second opinion, that what she did in her second opinion is she said, I don't find any evidence in the medical record to corroborate the statements that I've already heard from Mr. Jackson. For example, she looks at the letter by Nurse McFadden, and she discounts it. She says, there's no proof to back these statements outside of the patient's verbal report. Then, in her conclusion, by the way, I'm reading from A21, which is in the blue brief, the appendix in the blue brief. In her conclusion, she says, the situational episode of anxiety in the service cannot be assumed to be representative of bipolar disorder, as there is no evidence to support the statement. In other words, she's looked at his medical records. The way she's interpreted Mr. McAndrew's request, which is the way I interpret it, is don't consider his verbal statements. Consider only what's in the report. OK, but we would all have to say, wouldn't we, that the board knows what the correct law is, and you do consider what the veteran asserts, and what other lay witnesses assert, as well as psychiatric reports. I would submit, Your Honor, that the board did not know what the correct law is in this case. And the reason I say that is two reasons. First of all, the board considered this case in 2004, which was a couple of years before Buchanan, that that by itself is not determinative. But if you look at what the board said on supplemental appendix pages 43 and 44, the board goes through every bit of favorable evidence to Mr. Jackson and says, that's not in the medical record. That's not in the medical record. Nurse McFadden, that's not in the medical record. And then says, well, Dr. McGeachy, in second opinion, she freely revised her report. And I don't think she freely revised her report. I think she was given a new standard to look at, which is don't consider what Mr. Jackson is telling you. What the board was doing, I would submit, is it was doing exactly what this court said don't do in Buchanan. In Buchanan, the court said, don't just discount the patient's, the lay testimony, simply because it's not corroborated. But no one would be able to determine, no lay person would be able to determine whether somebody had, I don't think could determine whether somebody had bipolar disorder or when it started. Did he ever have the opportunity to bring in his own psychiatrist to give an opinion that it did start back then? The only psychiatrist's opinions I'm aware of is that he was diagnosed as having bipolar disorder by the VA in 1992. That was the first diagnosis, which was about 20 years after his service. And that he did not report that in those 20 years. But now, to address an earlier point you made, he himself doesn't have to do the diagnosis. He can just say, here's what I've been experiencing these last 20 years. I haven't been working. I've been drinking. I've been out of jobs. I've been paranoid all the time. And started in 1973. And the doctor can make a diagnosis based on those symptoms, if she finds them credible. That's what the court said in Buchanan and John Droe. And what the board is not, the VA is not allowed to do is say, I'm not going to consider that. That's just his testimony. Where is that in the medical records? Let me ask you. Did you get your answer? Mr. Hank, let me ask you. You said a minute ago, and I want to make sure you understand. You said that you're not saying that, this was during the rebuttal, a second. You said that you're not saying there was coercion in terms of Mr. Alexander, vis-a-vis the psychiatrist. But rather, she was given the wrong standard. But that would not be a constitutional violation, would it? That we'd have jurisdiction to hear. I mean, if in fact, you know, the supervisor says the doctor considered under these standards. Well, that may or may not be correct information. But assume it's incorrect. It's not a constitutional issue. It's just an error in the process. Do you know what I'm saying? I mean, how would, we would not then have jurisdiction, would we? I would submit that it is a constitutional violation. And let me say that when you do, when you are looking at a constitutional violation, you're allowed to examine all the facts underneath that constitutional violation. And if there have been a number of, am I, I'm sorry my red light's on. Is that okay if I finish the question? Finish the answer. There have been several cases from the Veterans Court in similar contexts where there have been a, like Cole Young v. West, Austin v. Brown, and Beale v. Brown, where they've submitted a request to the medical examiner that says, feel free to debunk this other doctor's report. Or something that's very suggestive. And the Veterans Court, I think correctly, has held that it's a constitutional violation. I mean, think if Dr. McAndrews, if Robert McAndrews had explicitly said, you are, in your conclusion, you are absolutely not to consider any statements made by Mr. Jackson, Lester, and the rest. That would directly contradict what this court said in Buchanan. That would have to be an unfair process that they've given them the wrong standard to use. And that's essentially what we submit happened here. All right. Thank you. Thank you. Take the case under review.